(95 P.3d 104)

No. 88,888

STATE OF KANSAS, *Appellee,* v. ROBERT M. CARVER, *Appellant.*

Opinion filed August 6, 2004.

*Sandra Carr*, assistant appellate defender, for appellant, and *Robert M. Carver*, appellant pro se.

*Boyd K. Isherwood*, assistant district attorney, *Nola Foulston*, district attorney, and *Phill Kline*, attorney general, for appellee.

Before RULON, C.J., ELLIOTT and HILL, JJ.

HILL, J.: In America, the foundation of our liberty is due process of law. Underpinning that foundation, for those accused of crimes, are the twin rights of being present at all critical stages of a criminal prosecution and being free to retain counsel of choice. Because Robert M. Carver was denied both of those rights, we must reverse his convictions and remand the case for a new trial.

We briefly list some of the facts about the crimes involved and then show how the case was handled by the district court.

## FACTUAL BACKGROUND

Richard Carver and Kimberly Buttel lived together in Wichita until they had a fight in September 2000. Carver then moved to a new residence in October of that year. Theirs has been a tempestuous relationship. A series of arguments and attempts at reconciliation followed.

Around Thanksgiving 2000, Carver broke into Buttel's residence where he found her in bed with Jason Clasen. Threatening both with a hammer, he hit Clasen in the head. Clasen fled to another bedroom, threw a speaker through the window, escaped out the window, and stood naked on the second story ledge. Meanwhile, Carver grabbed Buttel, dragged her from the residence, and fled with her in his car. They eventually checked into a motel. While

at the motel, Buttel talked to her mother, Donna Billionis, on the telephone. Carver also spoke with Billionis. Carver finally turned himself over to the police.

Eventually, Carver was convicted of aggravated battery, misdemeanor assault, aggravated burglary, and kidnapping.

## PROCEDURAL BACKGROUND

At Carver's first appearance, his trial was set for February 26, 2001. Prior to trial, the State moved to sever all of Carver's visitation, phone, and mail privileges at the jail because of a violation of a no contact order regarding Buttel. The court allowed Carver to retain his visitation privileges but opted to cut off his phone privileges and directed that all of Carver's mail go through his attorney.

About 1 week before Carver's first trial date, assistant district attorney Alice K. MacBeth told Carver's retained counsel, Robert Rumsey, that she was drafting a motion to remove him as counsel due to a conflict of interest stemming from Rumsey's representation of Buttel's mother 5 years earlier. Rumsey suggested that they should proceed immediately to see a judge. Following an unrecorded meeting in chambers without the defendant, Judge Clark V. Owens II disqualified Rumsey from representing Carver. Judge Owens then appointed the public defender's office to represent Carver even though Carver had neither requested court-appointed counsel nor filled out a financial affidavit for the appointment of counsel.

Two days after the date set for the trial, assistant public defender John Henderson finally introduced himself to Carver at the jail as his new court-appointed counsel. Carver immediately responded that he wanted Rumsey to represent him. Henderson advised Carver to file a pro se motion if he desired to raise his concerns regarding Rumsey's removal from his case. After Carver drafted the motion, Henderson distributed copies of the motion and filed it with the court.

In his motion, Carver alleged that Buttel's mother was using her position as director of the adult probation department to prejudice his case. Carver pointed out that Rumsey had not represented ei-

ther of the alleged victims, Buttel or Clasen, in his case and that Rumsey had been his private attorney for over 15 years. He stated that he had remitted $15,000 to Rumsey in partial payment of a retainer fee for his defense. Alternatively, Carver sought to hire another attorney from Rumsey's firm or to select an "attorney of my choice who is on [S]tate's attorneys list"; he did not want a public defender to represent him. Carver wrote: "Your honor, all I am asking for is for this motion to be heard and the opportunity to seek counsel myself with what I would consider to be adequate representation of my defense."

Carver's trial was scheduled for Judge Rebecca L. Pilshaw on April 30, 2001. Near the end of March or the beginning of April, Carver's family contacted local counsel to represent Carver without success. Finally, on April 19, 2001, Carver's brother and a family friend contacted attorney Christopher Magaña who agreed to represent Carver if the case could be continued.

On April 25, 2001, assistant district attorney MacBeth, the three defense attorneys connected to Carver's case (Rumsey, Henderson, and Magaña), and Carver himself appeared before Judge Pilshaw. Rumsey informed the court that he did not voluntarily withdraw but that he was removed from the case by the court. Regarding the absence of a record of the proceeding wherein Rumsey was removed, MacBeth attempted to explain:

"Unfortunately, Mr. Carver wasn't present for the conversation in Judge Owens' chambers, and I think to add to that, I mentioned, 'Do we need to have a record on this?' Judge Owens says, 'We need a record if Donna's going to waive it because we need to have that on the record. But if not, Rob's going to get off the case and we'll appoint someone else.' I think that's how we went down just so you know why we didn't have a record and why Mr. Carver wasn't available."

Assistant public defender Henderson informed Judge Pilshaw that Carver's pro se motion seeking Rumsey's reinstatement had not yet been placed on Judge Owens' docket. Henderson had tracked the motion, indicating it was scheduled for a hearing a few days following the hearing they were having that day. No hearing or ruling was ever made on Carver's motion. Henderson maintained:

"I suppose the theme that I'm projecting is [Carver] was unable to communicate either by mail or telephone with any family members. . . . But at any rate, it does appear that he has made every consistent effort to try to get an attorney, even given his limited abilities to communicate. And I don't think anyone could suggest at this point Mr. Carver was sitting on his rights in this regard and trying to delay."

Judge Pilshaw noted the absence of an accurate record of the proceedings where Rumsey had been removed as Carver's counsel and that the defendant had been without counsel for at least 1 week. She astutely observed:

"This thing has been messed up from the very beginning. No. 1, we have a rule, a district court rule, Rule 131 that says if you want — if you have a motion that you want to have heard, then you have to give seven days' notice.

"Ms. MacBeth, granted, you may have called Mr. Rumsey. Mr. Rumsey may be accepting the blame for how that came down, et cetera, but you have a requirement to notify not just Mr. Rumsey but to notify his client when you're trying to remove his lawyer from the case. Mr. Carver has a right to be present at all critical stages of the proceedings, *and I would say that when someone is talking about removing his lawyer from a case, that's a critical stage of the proceeding.*

"I'm not criticizing what Judge Owens has done. He has handled it in the way that he felt was the best in the exercise of his discretion as the presiding judge in his department. But the fact remains that as Mr. Henderson just pointed out, Mr. Carver was never given notice that -- well, he did point this out, Mr. Carver was never given notice that you were seeking formally to have his lawyer removed from the case. *He never requested that the public defender's office be appointed to represent him.*

"Finally, when Mr. Rumsey eventually gets over there to tell Mr. Carver and when Mr. Henderson gets over there to talk to Mr. Carver -- because let's remember, at your request, Ms. MacBeth -- I didn't allow Mr. Carver -- and he deserved it. I'm not apologizing for one minute for removing his privileges, *but he's over there in the jail now and has absolutely no way to communicate basically with anyone other than via kites in order to even try and obtain another attorney.* Not only that, but he appropriately files a motion. Maybe it's not with merit. It doesn't have any merit. Your motion, I mean, once — the motion may or may not have much merit, but on March 19, as early as March 19, *over a month ago he filed a motion to get in front of the judge basically to talk about the issue of who his lawyer was going to be, and then our clerks' office apparently messes up there and it's never even heard.*" (Emphasis added.)

The judge could have heard Carver's motion or taken testimony about the alleged conflict of interest. Instead, the court moved in

the same direction, thus confirming the prior judge's actions that were taken in the absence of the defendant:

"I understand and yesterday was fully willing to overrule the motion for a continuance, but it is not as if Mr. Carver has been resting on his laurels in attempting and just waited for the last moment to bring this before the Court. In my opinion at this particular stage it appears to me that the Court system has let Mr. Carver down, and while I sympathize with the concerns that you have, Ms. MacBeth, especially about your witness -- that's my biggest concern is about your witness. While I sympathize with that concern, I feel that I must grant the continuance in order to enable Mr. Carver to hire Mr. Magaña."

Magaña requested 6 weeks to prepare for Carver's trial. That was denied, but Judge Pilshaw granted a 30-day continuance or the case would go to trial the next week with court-appointed counsel.

Posttrial, the court denied Carver's motion for new trial in which he argued, in part, that he had been denied counsel of his choice.

We first review the fundamental due process rights afforded defendants so they can participate meaningfully in their own defense, the rights to counsel of choice and to be personally present at the proceedings. Next, we examine the record to see if there really was a conflict of interest for Carver's attorney and then decide if all of this is harmless error.

### FUNDAMENTAL RIGHT TO COUNSEL

Under the Sixth Amendment to the United States Constitution, the right to the assistance of counsel for one's defense is a fundamental right. *Kimmelman v. Morrison,* 477 U.S. 365, 374, 91 L. Ed. 2d 305, 106 S. Ct. 2574 (1986). We must point out that "[u]nlike a civil defendant, a criminal defendant's choice of his counsel is protected by the [S]ixth [A]mendment. In *Powell v. Alabama,* 287 U.S. 45, [77 L. Ed. 158, 53 S. Ct. 55] (1932), the Supreme Court stated: 'It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.' 287 U.S. at 53." *United States v. O'Malley,* 786 F.2d 786, 789 (7th Cir. 1986); see also *United States v. Laura,* 607 F.2d 52, 56 (3d Cir. 1979), *aff'd* 667 F.2d 365 (3d Cir. 1981), where the court stated that the de-

fendant's selection of counsel has been labeled as "the most important decision a defendant makes in shaping [a] defense."

Significantly, the Sixth Amendment right to counsel is "designed to assure fairness in the adversary criminal process." *Wheat v. United States*, 486 U.S. 153, 158, 100 L. Ed. 2d 140, 108 S. Ct. 1692, *reh. denied* 487 U.S. 1243 (1988). Therefore, a court may restrict the defendant's right to retain counsel of his or her choice if the defendant insists on an attorney he or she cannot afford, the attorney declines to represent the defendant for other reasons, the attorney is not a member of the bar, or counsel has a "previous or ongoing relationship with an opposing party, even when the opposing party is the Government." 486 U.S. at 159.

## *FUNDAMENTAL RIGHT TO BE PRESENT*

Our Supreme Court has ruled that a

"defendant's constitutional right to be present during criminal proceedings stems from the Sixth Amendment to the United States Constitution right to confront witnesses and the Fifth and Fourteenth Amendments to the United States Constitution due process right to attend critical stages of a criminal proceeding in which the defendant is not actually confronting witnesses or evidence against him or her. [Citations omitted.]" *State v. Mann*, 274 Kan. 670, 680, 56 P.3d 212 (2002).

"[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if the defendant's presence would contribute to the fairness of the procedure. [*Kentucky v. Stincer*, 482 U.S. 730, 745, 96 L. Ed. 2d 631, 107 S. Ct. 2658 (1987).] To be 'present' requires that a defendant be more than just physically present. It assumes that a defendant will be informed about the proceedings so he or she can assist in the defense. *United States v. Mosquera*, 816 F. Supp. 168, 172 (E.D.N.Y. 1993)." *State v. Calderon*, 270 Kan. 241, 245, 13 P.3d 871 (2000).

In *United States v. Treadway*, 328 F.3d 878 (6th Cir.), *cert. denied* 540 U.S. 860 (2003), Treadway maintained he had been denied due process when the district court failed to ensure his presence at a hearing where the withdrawal of his attorney was addressed. Shortly after Treadway retained his attorney, Agee, the State raised a potential conflict of interest regarding Agee when it indicated it would be calling one of Agee's former clients to testify against Treadway. Agee opted to withdraw; the district court entered an order granting the withdrawal. The same day, Treadway

retained another attorney who remained Treadway's attorney through conclusion of sentencing. In addressing Treadway's claim of a denial due process, the Sixth Circuit Court of Appeals stated:

"The Due Process of the Fifth Amendment states that '[n]o person shall . . . be deprived of life, liberty, or property, without due process of law.' U.S. Const. amend. V. The Supreme Court has identified notice and an opportunity to be heard as the hallmarks of procedural due process. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, [94 L. Ed. 865, 70 S. Ct. 652] (1950). Treadway cites no authority, nor can we find any, for his proposition that a hearing is required whenever an attorney seeks to withdraw from representation. Nevertheless, we do believe that, in the ordinary course, a criminal defendant should have notice and an opportunity to be heard when his attorney of choice seeks to withdraw from representation. *Cf. Anders v. California*, 386 U.S. 738, 744, [18 L. Ed. 2d 493, 87 S. Ct. 1396] (1967) (requiring an attorney, attempting to withdraw because an appeal is frivolous, to seek permission to withdraw from the court and to file a brief directing the court to anything in the record that might support the appeal) [Citations omitted.]. However, an oral hearing is not the only way to ensure that defendants receive notice and an opportunity to be heard. For example, counsel could serve the defendant with a motion of withdrawal and allow him an opportunity to file a response." *Treadway*, 328 F.3d at 887-88.

As in *Treadway*, the State here sought the withdrawal of the defense attorney. Likewise, Carver was not notified of the hearing. Further, he was not presented with a motion by the State informing him of the pending action or provided with an opportunity to respond. However, Carver's situation is even more egregious in that Rumsey did not voluntarily withdraw; he was removed. Carver's pro se motion seeking an opportunity to appear before the court was never heard or ruled upon.

In addition, K.S.A. 2003 Supp. 22-3405(1) provides that "[t]he defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence."

Carver had a constitutional and statutory right to be present at the proceeding where the district court removed his retained defense counsel for an alleged conflict of interest. The court erred when it denied him that right.

## REMOVAL OF COUNSEL FOR CONFLICT

When a trial court is advised of the possibility of a conflict by either the defendant or the State, the court is required to initiate

an inquiry to ensure that the defendant's right to effective assistance of counsel is not violated. *State v. Jenkins,* 257 Kan. 1074, 1080, 1083-84, 898 P.2d 1121 (1995); *State v. Lem'Mons,* 238 Kan. 1, 9, 705 P.2d 552 (1985) (Trial court should hold an in-depth hearing to determine existence of conflict of interest where there is a question of divided loyalty.). A trial court abuses its discretion if it fails to inquire further after becoming aware of a potential conflict between an attorney and client. *State v. Taylor,* 266 Kan. 967, 978, 975 P.2d 1196 (1999).

The determination of whether an attorney has a conflict of interest requiring disqualification is governed by an abuse of discretion standard. *In re Habeas Corpus Petition of Hoang,* 245 Kan. 560, 566-67, 781 P.2d 731 (1989), *cert. denied* 494 U.S. 1070 (1990). A determination of disqualification will be sustained where the court, in its sound discretion, finds either an actual conflict or a serious potential for conflict. *Wheat,* 486 U.S. at 164.

*NO CONFLICT*

The absence of any written or oral ruling or transcript of the trial court's hearing to address the claimed conflict of interest stands in contravention of Supreme Court Rule 165 (2003 Kan. Ct. R. Annot. 202), which states: "In all contested matters submitted to a judge without a jury, including motions for summary judgment, the judge shall state the controlling facts required by K.S.A. 60-252, and the legal principles controlling the decision." See also K.S.A. 2003 Supp. 60-252(a) which provides: "In all actions tried upon the facts without a jury or with an advisory jury or upon entering summary judgment or involuntary dismissal, the judge shall find, and either orally or in writing state, the controlling facts and the judge's conclusions of law thereon."

The Kansas Rules of Professional Conduct (KRPC) (2003 Kan Ct. R. Annot. 317) establish a two-part test to be used to determine if a conflict of interest may exist between a lawyer's present representation and representation of a former client. See *Hoang,* 245 Kan. at 565-66. The party alleging a conflict of interest violation has the burden of proof. *State v. Drach,* 268 Kan. 636, 643, 1 P.3d 864 (2000). KRPC 1.9 (2003 Kan. Ct. R. Annot. 381) provides that

a lawyer who has formerly represented a client in a matter shall not thereafter:

"(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

"(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known."

The Comment to KRPC 1.9 focuses on whether the lawyer has changed sides and is using just generally known information:

"The scope of a 'matter' for purposes of Rule 1.9(a) may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree. When a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests clearly is prohibited. On the other hand, a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client . . . . *The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question.*

"Information acquired by the lawyer in the course of representing a client may not subsequently be used by the lawyer to the disadvantage of the client. *However, the fact that a lawyer has once served a client does not preclude the lawyer from using generally known information about that client when later representing another client.*" (Emphasis added.) 2003 Kan. Ct. R. Annot. 381-82.

That comment also refers to the Comment to KRPC 1.7 (2003 Kan. Ct. R. Annot. 372) that gives some cautionary advice to courts ruling on motions to disqualify made by adversaries:

"Resolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation. In litigation, a court may raise the question when there is reason to infer that the lawyer has neglected the responsibility. *In a criminal case, inquiry by the court is generally required when a lawyer represents multiple defendants. Where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question. Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment.*" (Emphasis added.) 2003 Kan. Ct. R. Annot. 375.

The scant facts presented to Judge Pilshaw indicate that Rumsey did not represent Billionis in a substantially related matter in which Carver's interests were "materially adverse" to those of Billionis as contemplated by KRPC 1.9(a) (2003 Kan. Ct. R. Annot. 381). Rumsey told Judge Pilshaw that he had previously represented Billionis in an action to obtain custody of Buttel's children. Judge Owens had previously told Rumsey that he could continue to represent Carver if Billionis "waived the confidentiality," and when Billionis refused, Rumsey was removed. The State indicated to Judge Pilshaw that Rumsey's account accurately reflected the events leading to Rumsey's removal.

Additionally, Rumsey would not have been required to use information relating to Billionis' representation in his defense of Carver other than perhaps what had become generally known. Billionis obtained custody of two of Buttel's four children 5 years prior to Carver's trial. We do not see how Rumsey's representation of Billionis in a child custody proceeding 5 years earlier could be used to Buttel's disadvantage in Carver's trial, especially since the State had filed a motion in limine requiring the defense to refrain from:

"mentioning, alluding to, commenting upon, posing questions in regard to or making any reference whatsoever to the following:

"(1) Any character or credibility evidence in the form of specific instances of conduct regarding Kimberly Buttel.

"(2) Any reputation or opinion testimony regarding any character trait or credibility of Kimberly Buttel without first allowing the State to challenge the witness outside the jury's presence to test the foundation of the evidence.

"(3) *Any evidence regarding any and all child custody actions involving Kimberly Buttel's children.*" (Emphasis added.)

At a hearing on the motion, defense counsel argued that he wanted to convey to the jury that the fear Buttel expressed to Billionis during a telephone conversation they had while she was with Carver during the kidnapping may have been attributed to Buttel's fear that Billionis would take her other two children rather than Buttel being fearful of Carver. In order to establish this point, the defense maintained it was important to show that Billionis already had custody of two of Buttel's children. The trial judge responded,

"I'm not going to allow this jury or anyone else to be distracted *by matters that have nothing to do with this case* - I can assure both parties of that - and that includes relationship of the parties evidence and it includes anything to do with child custody." (Emphasis added.) The trial judge reserved ruling on the State's motion, instructing counsel to approach the bench outside the presence of the jury should evidence concerning child custody become relevant or if the door was opened through the course of the trial. These facts demonstrate that there was no real possibility of Rumsey using confidential information as contemplated by KRPC 1.9(b) (2003 Kan. Ct. R. Annot. 381).

The State does not contend that an actual conflict of interest existed which prevented Rumsey from continuing to represent Carver. See *Mickens v. Taylor,* 535 U.S. 162, 172 n.5, 152 L. Ed. 2d 291, 122 S. Ct. 1237, *reh. denied* 535 U.S. 1074 (2002) ("An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.") However, the State indicates that "apparently" a "possibility of a conflict" existed precluding Rumsey from continuing to represent Carver. The State suggests *Hoang* was the precedent relied on by the district court in disqualifying Rumsey.

In *Hoang,* the public defender informed the State on opening day of trial that another attorney from his office had defended the key prosecution witness, Tran. The trial court was alerted to the possible conflict of interest when the State filed a motion in limine to bar defense counsel from bringing out the prior representation. The trial judge concluded that Hoang's attorney would face a conflict of interest when cross-examining Tran, having imputed knowledge of confidential communications from Tran. Subsequently, the trial judge disqualified defense counsel and declared a mistrial.

The public defender's office had handled Tran's case while Hoang's case was on appeal. Here, Rumsey's representation of Billionis dated back 5 years; Carver and Billionis had moved in together less than 2 years before the trial. It is unlikely that Rumsey had received any confidential communications from Billionis during his representation of her which would relate to Carver's case.

Moreover, the facts in *Hoang* indicate that Tran "was a key prosecution witness against Hoang." 245 Kan. at 561. One cannot characterize Billionis as a key prosecution witness as she was not a conspirator, an aider or abettor, and not even an eyewitness to the events. For the most part, Billionis' testimony was simply used to provide background information.

In summary, "the decision to disqualify an attorney in a criminal case requires an evaluation of the interest of the defendant, the [G]overnment, the witness and the public in view of the circumstances of each particular case. See *United States v. James*, 708 F.2d 40, 44 (2d Cir. 1983); *United States v. Cunningham*, 672 F.2d 1064, 1073 (2d Cir. 1982). Accord *United States v. Garcia*, 517 F.2d 272, 273 (5th Cir. 1975)." *United States v. O'Malley*, 786 F.2d 786, 790 (7th Cir. 1986).

Carver expressed his desire to retain his chosen counsel by filing a pro se motion seeking reinstatement of Rumsey. Carver told Judge Pilshaw that he did not see a conflict of interest requiring Rumsey's removal. In his motion for a new trial, Carver argued that he had been denied the counsel of his choice. In addition to Carver's continued desire to have Rumsey represent him, Carver had also paid Rumsey a substantial retainer fee for the work completed on his case, covering at least 2 months of trial preparation. The State charged Carver in November 2000 but did not seek to remove Rumsey until 1 week before Carver's trial scheduled for February 2001.

Also, the State had appropriately filed a motion in limine, alerting the court of its intent to protect its witness, Buttel, regarding the child custody issue that was the subject matter of Rumsey's prior representation of Billionis. Therefore, the State had the necessary tool to ensure that the possibility of a conflict had no effect on the trial.

In the absence of a journal entry setting forth the required findings of fact and conclusions of law and with a record demonstrating that the potential for a conflict of interest was nonexistent, we believe the trial court did abuse its discretion in disqualifying Rumsey from representing Carver. This is especially true in light of the fundamental right Carver has to counsel of his choice.

## NOT HARMLESS ERROR

The State contends any error was harmless in that Carver attended a subsequent hearing and was ultimately allowed to retain counsel "which represented him so well the defendant was acquitted of two charges and convicted of a lesser offense on a third charge." The determination of whether an error is structural or harmless involves a question of law over which an appellate court exercises unlimited review. *State v. Hill*, 271 Kan. 929, 934, 26 P.3d 1267 (2001).

In *State v. Mann*, 274 Kan. 670, 680-83, 56 P.3d 212 (2002), our Supreme Court reviewed decisions that considered harmless error when the defendant has been denied the opportunity to be present at a critical stage of proceedings. The court then stated:

"In *Calderon*, this court addressed the issue of whether harmless error could prevent reversal once a defendant's constitutional right to be present during a critical stage of the proceeding had been violated. Calderon was found to have been denied his constitutional right to be present at a critical stage when the trial court ordered the interpreter, necessary for Calderon to understand the proceedings, not to translate closing arguments for Calderon. The court examined the distinction between trial errors, which are subject to a harmless error analysis, and structural errors, which require a new trial. In reversing Calderon's conviction, the majority of the court concluded that the failure to translate the closing arguments implicated a basic consideration of fairness and that a harmless error analysis was inappropriate under the circumstances. 270 Kan. at 253." *Mann*, 274 Kan. at 682-83.

However, the *Mann* court went on to consider the result in *State v. Lopez*, 271 Kan. 119, 134, 22 P.3d 1040 (2001), where the court determined a harmless error analysis should be applied. In *Lopez*, the defendant complained that the judge conversed with counsel outside his·presence prior to voir dire regarding the qualification of potential jurors and that the judge, both counsel, and a juror met outside the defendant's presence on the second day of trial. The *Lopez* court found it was not structural error because, although Lopez had been denied a meaningful presence at a critical stage of his trial, "his absence did not implicate a basic consideration of fairness or undermine the function of a criminal trial. 271 Kan. at 134." *Mann*, 274 Kan. at 683.

Here, the issue is not only Carver's absence at the hearing where his counsel of choice was removed, compounded by the lack of a record of the proceedings and any written or oral rulings, but also the fact that removal of his counsel does not appear to have been necessary. Arbitrary removal of defense counsel can be a determinative factor for whether the defendant is entitled to a new trial. For example, in *Harling v. United States,* 387 A.2d 1101 (D.C. Ct. App. 1978), the District of Columbia Court of Appeals reversed and remanded for a new trial after finding the trial court unnecessarily interfered with the defendant's right to counsel.

In *Harling,* defense counsel informed the court that he could not be effective after a motion for discovery was summarily denied. The trial judge disqualified defense counsel after charging that counsel was attempting to establish a record of ineffective assistance of counsel for appeal. Counsel responded that he was simply trying to bolster his argument in favor of the motion being granted. The appeals court found that the trial court's "response to counsel's persistence was both intemperate and unwise." The "obduracy" of the trial judge was further noted when he refused to reinstate the defense counsel on appellant's request which was filed 11 days after his removal. 387 A.2d at 1105.

The Government argued that reversal was not required because the defendant eventually received competent defense counsel. The court rejected this argument, determining that it was irrelevant that substitute counsel had not been proven ineffective. Instead, the court noted the difference between "an arbitrary infringement on the right to assistance of counsel and interference with the attorney-client relationship" and a claim of ineffective assistance of counsel:

"The claimed deprivation is an arbitrary infringement on the right to assistance of counsel and interference with the attorney-client relationship, not a claim of ineffective assistance of counsel. Reversal is required even though no prejudice is shown. 'The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.' *Glasser v. United States,* 315 U.S. 60, 76, [86 L. Ed. 2d 680, 62 S. Ct. 457] (1942). See also *Holloway v. Arkansas,* [435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1978)]; *English v. State,* [8 Md. App. 330, 259

A.2d 822, 826 (1969)]; *Smith v. Superior Court of Los Angeles County*, [68 Cal.2d 547, 68 Cal. Rptr. 1, 440 P.2d 65 (1968)]." 387 A.2d at 1106.

In *United States v. Treadway*, 328 F.3d 878, 888 (6th Cir.), *cert. denied* 540 U.S. 860 (2003), the Sixth Circuit Court of Appeals found that:

"the failure to provide Treadway an opportunity to be heard on Agee's withdrawal was error and that it was plain. [Citation omitted;] *cf. Guenther v. Commissioner*, 889 F.2d 882, 884 (9th Cir. 1989) (noting that an ex parte communication violates a party's right to due process if the party was denied the 'opportunity to participate in determination of the relevant issues' and thereby suffered prejudice)."

Thus, the *Treadway* court went on to determine whether the defendant had suffered any prejudice. See *State v. Flournoy*, 272 Kan. 784, 795, 36 P.3d 273 (2001) (" 'The Kansas harmless error statute encompasses the federal harmless error and plain error rules.' " [Citations omitted.]) The court considered it important that Treadway had never objected to the removal of Agee or to the substitution of his replacement attorney and he had not indicated the replacement attorney provided unsatisfactory representation. 328 F.3d at 889. Thus, the court concluded that Treadway had failed to show how the removal of Agee had "affected his substantial rights or the 'fundamental fairness, honesty, or public reputation' of his judicial proceeding." 328 F.3d at 889.

Neither Treadway nor Carver contended that they received ineffective trial representation, but the rest of the facts in *Treadway* are distinguishable from those in Carver's case. Carver was not made aware of the possibility of a conflict of interest before the hearing. Rumsey, his attorney, did not withdraw; he was removed. Carver did not retain replacement counsel the same day; instead, he was appointed a public defender even though he had neither requested one nor filled out a financial affidavit. Carver's pro se motion seeking reinstatement of Rumsey was not placed on the trial judge's docket. The curtailment of Carver's communication privileges in jail intensified the difficulties he encountered in procuring retained counsel. Only through the assistance of a family member was Carver able to locate counsel to represent him. Carver's retained counsel proceeded to trial after being granted a

30-day continuance, even though he requested 6 weeks to prepare. Obviously, the trial court's errors affected the fundamental fairness, honesty, or public reputation of Carver's judicial proceedings.

The State says the error should be deemed harmless because Carver's attendance was ensured at a subsequent hearing. However, at that hearing the court never ruled upon the conflict of interest forcing Rumsey's removal from the case, and the court did not offer Carver the option of such a hearing where he would be apprised of the complexities of a possible conflict of interest, as well as the opportunity to waive any such conflict.

Further, the State contends that Carver was provided counsel of his choice. This argument should be viewed in light of the nearly insurmountable difficulties Carver endured to obtain counsel of his choice. His appointed public defender, Henderson, described to the court that lack of attention paid to Carver's case initially as Carver was so intent on obtaining other counsel. Additionally, Henderson pointed out to Judge Pilshaw that Magaña entered as Carver's third representative. Henderson stated the case files had been organized in different ways by different people on two occasions. Previous representation by other counsel made subsequent representation more difficult. Out of concern for Carver's representation, Rumsey also expressed to the court the complexity of Carver's case and the need for adequate time for Magaña to prepare for Carver's trial. Further, Judge Pilshaw made it clear that the continuance was contingent on Magaña agreeing to represent Carver; otherwise, Carver's trial would begin the following week.

We cannot deem the deprivation of Carver's right to defense counsel of choice under these circumstances as a harmless error. Carver is entitled to a new trial with counsel of his own choosing.

Reversed and remanded for a new trial.